# United States Court of Appeals for the Federal Circuit

———————————

**UNITED STATES CAPITOL POLICE,**
*Petitioner*

**v.**

**OFFICE OF COMPLIANCE,**
*Cross-Applicant*

**FRATERNAL ORDER OF POLICE, DISTRICT OF COLUMBIA LODGE NO. 1, U.S. CAPITOL POLICE LABOR COMMITTEE,**
*Intervenor*

———————————

2018-1201, 2018-1395

———————————

Petitions for review of a decision of the Board of Directors of the Office of Compliance in No. 15-LMR-02 (CA).

———————————

Decided: January 25, 2019

———————————

KELLY MARISSA SCINDIAN, Office of Employment Counsel, United States Capitol Police, Washington, DC, argued for petitioner. Also represented by FREDERICK M. HERRERA.

JOHN D. UELMEN, Office of the General Counsel, United States Office of Compliance, Washington, DC,

argued for cross-applicant. Also represented by JULIA AKINS CLARK; SIMONE N. JENKINS, Congressional Office of Compliance, Washington, DC.

DAVID WILLIAM RICKSECKER, Woodley & McGillivary LLP, Washington, DC, argued for intervenor.

———————————

Before NEWMAN, LOURIE, and CLEVENGER, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

On September 25, 2017, the Board of Directors of the Congressional Accountability Office of Compliance ("Board") issued a decision stating that the United States Capitol Police ("Police") committed an unfair labor practice when it refused to comply with a decision of an arbitrator made pursuant to a collective bargaining agreement to which the Police is a party. *U.S. Capitol Police and Fraternal Order of Police, D.C. Lodge No. 1 U.S. Capitol Police Labor Comm.*, No. 15–LMR–02, 2017 WL 4335143 (C.A.O.C. Sept. 25, 2017).

## BACKGROUND

The Congressional Accountability Act of 1995 ("Act"), among other things, affords congressional employees the right to join together in bargaining units, bargain with their employer over conditions of employment, enter collective bargaining agreements, and resolve disputes through grievance and arbitration procedures specified in those collective bargaining agreements. 2 U.S.C. §§ 1301–1438.[1] The Act achieves those goals by incorporation of

———————————

[1] The CAA was amended on December 21, 2018. *See* Congressional Accountability Act of 1995 Reform Act, Pub L. No. 115-397, 132 Stat. 5297 (2018). All citations to the Act refer to the applicable provisions in effect before the 2018 amendments, unless otherwise indicated.

many provisions found in chapter 71 of Title 5 of the U.S. Code relating to federal service labor-management relations. *See, e.g., id.* § 1351 (incorporating provisions in chapter 71 of Title 5). The Act created the Office of Compliance ("OOC"), which is overseen by its Board. *Id.* § 1381. For labor-management relations arising under the Act, the Board exercises the authorities of the Federal Labor Relations Authority under specified sections of chapter 71. *Id.* § 1351(c)(1). The Board is authorized to issue regulations to carry out the Act, and to submit a matter presented to it to a hearing officer, subject to review by the Board. *Id.* §§ 1351(c)(1), 1351(d)–(e), 1384.

The Fraternal Order of Police, District of Columbia Lodge No. 1, U.S. Capitol Police Labor Committee ("Union") entered into a Collective Bargaining Agreement ("CBA") with the Police, effective June 8, 2010. The CBA provides that employee termination (defined as "removal") is a disciplinary action subject to the grievance and arbitration provisions of the CBA. J.A. 691, 697–98, 701–02. Section 32.14 of the CBA provides that when the grievance and arbitration processes are invoked, "[t]he decision of the arbitrator is final and binding." J.A. 702. The refusal by an agency to comply with a final arbitration award constitutes an unfair labor practice under the Act. 2 U.S.C. § 1351(a)(1) (incorporating 5 U.S.C. § 7116(a)(1), (8) into the Act).

The Police is headed by the Chief of Police, who is appointed by and serves at the pleasure of the Capitol Police Board, which was created in 1867, and is composed of the Architect of the Capitol as well as the Sergeants at Arms of the U.S. House of Representatives and the U.S. Senate. *Id.* §§ 1901, 1961(a), 1969(a). The Capitol Police Board oversees the Police and supports its mission. H.R.J. Res. 2, 108th Cong. § 1014 (2003). The Chief of Police, an ex officio member of the Capitol Police Board, "is authorized to appoint, hire, suspend with or without pay, discipline, discharge, and set the terms, conditions, and privileges of

employment of employees of the Capitol Police, subject to and in accordance with applicable laws and regulations." 2 U.S.C. § 1907(e)(1)(A). The United States Capitol Police Administrative Technical Corrections Act of 2009 ("TCA"), Pub. L. No. 111-145, 124 Stat. 49 (2010), amended a previous law providing for approval of Chief of Police termination decisions by the Committee on House Administration of the House of Representatives and the Committee on Rules and Administration of the Senate to instead place that approval authority in the Capitol Police Board. *Compare* 2 U.S.C. § 1907(e)(1)(B)(i) (2006), *with id.* § 1907(e)(1)(B) (2012). With regard to the role of the Capitol Police Board in an employee termination, the TCA reads:

> The Chief may terminate an officer, member, or employee only after the Chief has provided notice of the termination to the Capitol Police Board (in such manner as the Board may from time to time require) and the Board has approved the termination, except that if the Board has not disapproved the termination prior to the expiration of the 30-day period which begins on the date the Board receives the notice, the Board shall be deemed to have approved the termination.

2 U.S.C. § 1907(e)(1)(B) (2012).

Under the Act, the duty to bargain in good faith over conditions of employment extends to such conditions "to the extent not inconsistent with any Federal law or any Government-wide rule or regulation . . . ." 5 U.S.C. §§ 7102, 7117(a)(1); *see also* 2 U.S.C. § 1351(a)(1) (incorporating those provisions of chapter 71 of Title 5 into the Act). In addition, matters "specifically provided for by Federal statute" are not "conditions of employment" subject to collective bargaining, and therefore fall outside the duty to bargain. 5 U.S.C. § 7103(a)(14)(C), effective under the Act pursuant to Office of Compliance Final

Regulations § 2421.3(m)(3) ("OOC Regs."); *see also* 142 Cong. Rec. H10237, at H10370–71 (daily ed. Sept. 12, 1996) (noticing the OOC's issuance of final regulations).

In this case, the Police on June 28, 2013, terminated one of its officers for misconduct, and the termination was specifically approved by the Capitol Police Board. The terminated officer invoked his rights under the CBA, seeking to arbitrate the question of whether his termination was proper. The arbitrator on May 13, 2014, held that for the misconduct shown, termination was excessive, and instead a 30-day suspension was proper. The arbitrator directed the Police to reinstate the officer, without setting a deadline for reinstatement, and awarded the officer back pay and benefits. The Police filed exceptions to the arbitration award with the Board, which in due course the Board denied on December 12, 2014. After back and forth communications among the Union, the Police, and the arbitrator over whether the Police would comply with the arbitrator's decision, the arbitrator on February 18, 2015, gave the Police a 30-day deadline for compliance. Just a few days before the deadline, the Police told the Union for the first time that it absolutely refused to comply with the direction of the arbitrator to reinstate the officer and provide the Union with information it previously requested.

The Union filed charges with the OOC alleging that the refusal by the Police to comply with the arbitrator's decision constituted an unfair labor practice, and the General Counsel of the OOC filed an unfair labor practice complaint with the Board. The hearing officer assigned to the complaint sustained the charge, and on review the Board agreed with the hearing officer.

Before the Board, the Police argued on the merits that the arbitrator lacked jurisdiction over the subject of employee termination. Without jurisdiction, the arbitrator's award would be of no effect, and consequently refusal

to comply with the arbitrator's decision could not constitute an unfair labor practice. In addition, the Police argued that the Union's unfair labor practice charge was untimely filed, and consequently the hearing officer's decision has no effect. The Police's jurisdictional arguments, repeated now on appeal, contended that the subject of employee termination is barred from inclusion in a CBA because inclusion would be inconsistent with law. In addition, the Police argued that the subject of employee termination is specifically provided for by federal statute, and thus excluded from the scope of a CBA.

The Board held that the unfair labor practice charge was timely filed, and rejected the Police's jurisdictional arguments. On September 25, 2017, the Board issued its decision and order. The order specifies that the Police cease and desist from failing to fully implement the arbitrator's May 13, 2014, award, as supplemented by the arbitrator's June 17, 2014, order.

The Police petitions this court for review of the Board's decision, and the OOC for its part cross-applies to this court for an order enforcing the Board's decision and order. We have jurisdiction over the Police's petition under 2 U.S.C. § 1407(a)(1)(D) and jurisdiction over the OOC's application under 2 U.S.C. § 1407(a)(2). We apply the Administrative Procedure Act ("APA") standard of review, 5 U.S.C. § 706, to enforcement actions brought under § 1407(a)(2). *U.S. Capitol Police v. Office of Compliance* ("*Capitol Police I*"), 908 F.3d 748, 758 (Fed. Cir. 2018). As for the Police's petition, we apply the standard of review set out in 2 U.S.C. § 1407(d), which we have said "is essentially identical to the APA standard." *Id.* at 755 n.4.

For the reasons set forth below, we deny the Police's petition and grant the OOC's application.

### THE ISSUES

This case does not present any challenge to the merits of the arbitrator's decision to reinstate the officer in question, nor is there any question that the CBA, to which the Police is bound, required an arbitrator vested with jurisdiction to make a final decision in the case. The only question before us is whether the Police committed an unfair labor practice. The Police does not contest that refusal to comply with an arbitrator's award under a CBA is an unfair labor practice. The Police argues here, as below, that the arbitrator had no jurisdiction over the case in the first place, leaving the arbitral award a nullity on its face, and thus refusal to comply with the award cannot constitute an unfair labor practice.

The Police's jurisdictional argument is presented in two forms. The first is that the subject of employee termination is excluded entirely from CBAs covering legislative branch employees. That argument is premised on the fact that the Act does not provide for judicial review of employee termination decisions, and borrows its strength from cases decided under the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, § 205, 92 Stat. 1111, 1143. Under that statutory regime, which covers executive branch employees, certain employees lack judicial review of adverse actions taken against them by executive branch agencies. In a number of post-CSRA cases, executive branch employees lacking statutory appeal rights under the CSRA sought to obtain judicial review of adverse actions taken against them in other fora. In *United States v. Fausto*, 484 U.S. 439 (1988), and subsequent related cases, it was held that where Congress denied direct judicial review in the CSRA, it would violate the CSRA to permit an alternative avenue of judicial review. Because the Act provides no direct judicial review for employee termination, and because the CBA grants review of employee termination, the Police argues the situation under the CBA is like that in the post-CSRA

cases, where a party denied judicial review by the CSRA was denied judicial review elsewhere. The Police thus contends that it is inconsistent with that CSRA body of law to allow employee termination to be covered in a CBA. The Police argues that the above body of law should lead this court to conclude that it would violate the Act to permit arbitration over employee termination. The Act on its face permits the subject of employee termination to be included in a CBA, but the Police argues that to give the Act its plain meaning will make the Act inconsistent with law.

The Police's second jurisdictional argument rests on its view that the subject of employee termination is not a condition of employment, because it has been "specifically provided for" by the TCA, and therefore the subject of employee termination must be deemed excluded from the CBA.

The Police also asserts that the unfair labor practice complaint filed by the Union was untimely, and as such the hearing officer's decision cannot stand, and that the Board's determination that the Police committed an unfair labor practice by its refusal to respond to the Union's information requests is erroneous.

The OOC does not take issue in this case with the Police's view that lack of subject matter authority over an issue renders an arbitral award a nullity and hence that non-compliance is not an unfair labor practice. Instead, the OOC argues that the Police's grounds for removing employee termination from the CBA lack merit. The OOC also argues that the Police's challenge to the timeliness of the unfair labor practice complaint lacks merit, as well as the Police's challenge to the unfair labor practice offense based on failure to provide requested information.

We address the Police's arguments in turn below.

EMPLOYEE TERMINATION AS AN IMPERMISSIBLE CBA
SUBJECT

As noted above, the Police fashions the broad subject matter exclusion argument as based on case law developed under the CSRA. In its brief, the Police argues that it would be inconsistent with law to allow employee termination to be decided under a CBA. That argument by the Police has been rejected recently by this court, and hence need not be addressed in great detail here.

In *Capitol Police I*, the Police argued, as here, that employee termination is not legal subject matter for a CBA, because allowing the subject in a CBA would be inconsistent with law. 908 F.3d at 763. *Capitol Police I* involved an attempt by the Police to avoid bargaining over the subject of employee termination, *id.* at 753, whereas the Police attempts here to avoid an unfair labor practice on the ground that the subject of employee termination is wholly outside the reach of a CBA. While the fact setting of the two cases is different, the jurisdictional argument is the same. The complete rejection of the Police's CSRA-based jurisdictional contention in *Capitol Police I* commands its rejection here.

In *Capitol Police I*, this court explained in detail why the subject matter exclusion argument fails. *See id.* at 763–65. In short, *Fausto* dealt with executive branch employees who sought to end run the CSRA to obtain judicial review when Congress had specified that those employees should not have judicial review. *Id.* at 763. The related cases in our sister circuits, mainly *Department of the Treasury, Office of Chief Counsel v. Federal Labor Relations Authority*, 873 F.2d 1467 (D.C. Cir. 1989), and *U.S. Department of Health & Human Services v. Federal Labor Relations Authority*, 858 F.2d 1278 (7th Cir. 1988), which were discussed in *Capitol Police I*, dealt with executive branch employees who were also seeking to end run the CSRA's denial of judicial review by asser-

tion of arbitration remedies and similarly held that such remedies would violate the CSRA. *Capitol Police I*, 908 F.3d at 763–64. But those cases dealt with the CSRA, which created the Merit Systems Protection Board ("MSPB"), and gave certain classes of executive branch employees the right to challenge their terminations by election either through the MSPB hearing mechanism, or through arbitration where available under a CBA, but not both. *Id.* at 764 (citing 5 U.S.C. § 7121(e)(1)). Under either avenue, the initial adjudication is reviewed in this court on appeal. The Act, on the other hand, does not afford some legislative branch employees a choice between access to the MSPB or arbitration, and deny such choice to other legislative branch employees. The post-CSRA case law was necessary to preserve the structure of the CSRA. Denying arbitration of employee termination is not necessary to preserve the structure of the Act, which by its explicit terms allows for arbitration of employee termination. *Id.* at 764–65.

*Capitol Police I* rejected the analogy to *Fausto* and its progeny. *Id.* at 763–65. Indeed, the lead circuit court case relied on by the Police, as explained in *Capitol Police I*, supports the conclusion that the absence of judicial review of legislative employee termination under the Act does not undermine arbitrator review of termination decisions. *See id.* at 764 (discussing *Dep't of the Treasury*, 873 F.2d 1467). We again reject the Police's *Fausto*-based jurisdictional argument.

## THE TCA AS A BAR TO ARBITRATION OF EMPLOYEE TERMINATION

The Police mounts two jurisdictional arguments based on the TCA, which as noted above provides a form of ratification of an employee termination decision of the Chief of Police by the Capitol Police Board. First, the Police asserts that to permit arbitration over employee termination would be inconsistent with law, meaning

inconsistent with the TCA because of the Capitol Police Board's ratification authority. That argument was squarely rejected in *Capitol Police I*, and we need not repeat our detailed statutory analysis of the TCA, which led us to conclude that the TCA does not stand in the way of arbitration of employee termination. *Id.* at 760–62.

The Police also argues that the TCA should be interpreted to specifically provide for employee termination, eliminating the subject of employee removal from arbitration because, if specifically provided for by law, it would not be a condition of employment. OOC Regs. § 2421.3(m)(3). The rationale underlying both jurisdictional arguments based on the TCA is similar. The rationale is that the TCA gave the Capitol Police Board sufficient authority over employee termination both to "specifically provide" for employee termination and to make arbitration over employee termination inconsistent with the TCA.

The Chief of Police has the authority to decide whether an officer should be terminated. 2 U.S.C. § 1907(e)(1)(A). Once the Chief of Police exercises his discretion and orders a termination, the TCA gives the Capitol Police Board three options. It can act specifically to ratify that decision, or act specifically to disapprove a termination. *Id.* § 1907(e)(1)(B). Its third option is to remain silent, taking no position. *Id.* If the Capitol Police Board elects the third option, it fails to act and the TCA acts for it by providing ratification of the termination decision made by the Chief of Police. *Id.* Ratification provided by the third option provides approval by the force of law, not by an active decision by the Capitol Police Board. In short, the TCA does not require the Capitol Police Board's actual participation in employee termination decisions.

The Supreme Court has interpreted the language "to the extent such matters are specifically provided for by

Federal statute." In *Fort Stewart Schools v. Federal Labor Relations Authority*, 495 U.S. 641 (1990), the statutory language was construed narrowly to mean that a federal statute must occupy a subject entirely in order to specifically provide for a subject and thus make it not a condition of employment. *Id.* at 645–50. In that case, the issue was wages and benefits for employees of two elementary schools owned and operated by the U.S. Army. *Id.* at 643. The schools refused to bargain over the issue on the ground that wages and benefits for the overwhelming majority of Executive Branch employees are fixed by law, in accordance with the General Schedules of the Civil Service Act, and therefore are specifically provided for by federal statute. *Id.* at 643–50. The Supreme Court rejected the school's argument, because the school's employees were among a miniscule minority of Executive Branch federal employees whose wages and benefits are excluded from operation of the General Schedules. *Id.* at 649. Because the subject of wages and benefits for all Executive Branch federal employees is not completely governed by the statute cited, the Supreme Court held that the subject is not specifically provided for by federal law. *Id.* at 645–50.

The narrow reading of the "specifically provided for" language in *Fort Stewart* has been applied in subsequent cases. Where a federal statute completely occupies a subject, leaving entire authority over a subject within the statute, the statute is considered to specifically provide for the subject. Conversely, where a federal statute refers to a matter and provides for it but leaves some authority over the subject outside the reach of the statute, the statute does not specifically provide for the subject. *See Dep't of the Air Force v. Fed. Labor Relations Auth.*, 844 F.3d 957, 964 (D.C. Cir. 2016); *Int'l Ass'n of Machinists & Aerospace Workers Franklin Lodge No. 2135 and U.S. Dep't of the Treasury Bureau of Engraving & Printing*, 50 F.L.R.A. 677, 681–84 (1995).

Because the TCA gives the Capitol Police Board only a piece of the subject matter of employee termination, and even that piece—its stated ratification of the actual termination decision made by the Chief of Police—can be avoided by remaining silent in the face of termination ordered by the Chief of Police, it hardly can be said that the TCA meets the test of *Fort Stewart*.

We also note that we previously observed in *Capitol Police I* that the TCA falls short of the *Fort Stewart* test. That observation was made in connection with the "specifically provided for" jurisdictional argument in the Police's opening brief, after the Police at oral argument abandoned the specifically provided for argument under the TCA in favor of its alternative "inconsistent with law" argument under the TCA. *Capitol Police I*, 908 F.3d at 760 n.10. Moreover, it is also noteworthy that the Police in its reply brief in this case did not respond to the OOC's contention that the TCA is not a "specifically provided for" statute under *Fort Stewart*.

TIMELINESS OF THE UNFAIR LABOR PRACTICE COMPLAINT

An unfair labor practice charge must be filed within 180 days of the occurrence of the alleged unfair labor practice. *See* 2 U.S.C. § 1351(c)(2) (incorporating 5 U.S.C. § 7118(a)(4)(A)). The Union charged that the Police committed an unfair labor practice when it failed to implement the May 13, 2014 arbitrator's award that had been supplemented and clarified by the arbitrator's June 17, 2015 final order. The Union's charge, filed July 28, 2015, was challenged by the Police as untimely.

The limitations period for filing an unfair labor practice charge is triggered in one of two ways: "(1) when a party expressly notifies a party that it will not comply with the obligations required by an award, or (2) when an award establishes a deadline for implementing obligations required by the award and the deadline passes without the party taking any action to implement the award."

*U.S. Dep't of the Treasury Internal Revenue Serv. Wash. D.C. and Nat'l Treasury Emps. Union*, 61 F.L.R.A. 146, 150 (2005); *accord Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.* ("*NTEU*"), 392 F.3d 498, 500–01 (D.C. Cir. 2004).

The timeline concerning the arbitrator's award in this case starts with the date of the initial arbitration award:

1. May 13, 2014 – arbitrator directs the officer to be returned to service, without setting a deadline for compliance.

2. May 22, 2014 – Union requests additional information from the Police necessary to implement the arbitration award.

3. June 12, 2014 – Police files exceptions to the arbitration award with the Board, and arbitrator stays implementation of his award pending Board review.

4. December 12, 2014 – Board denies the Police's exceptions.

5. December 16, 2014 – arbitrator removes the stay on implementation of the May 13, 2014 award, and directs the Police to provide the Union with its May 22, 2014 information request, without setting any deadline for compliance.

6. December 19, 2014 – Police responds to the arbitrator's December 16, 2014 communication, acknowledging its receipt and saying "[w]e will continue to work with the Union's counsel on issues related to the award . . . ." J.A. 135.

7. January 15, 2015 – Union sends email message to the Police, asking for the status on its information request and when the officer should report for duty.

8. January 26, 2015 – arbitrator writes the Police and the Union, inquiring about the status of the officer's reinstatement, and if reinstatement had not occurred, asking to be informed when the parties expected to fully enforce the arbitration award, without setting any deadline for compliance.

9. January 26, 2015 – Union notifies the arbitrator that the Police has not reinstated the officer and has ignored the Union's information request.

10. January 26, 2015 – counsel for the Police responds to the January 15, 2015 inquiry from the Union, saying "I am waiting to hear from my client as to how it wishes to proceed, and will notify you once I have a response. I anticipate knowing something in the next couple of weeks." J.A. 498.

11. February 11, 2015 – Union emails the arbitrator complaining that it has heard nothing from the Police about the officer's reinstatement or its information request, and requesting the arbitrator to order the Police to comply with the reinstatement and the information request.

12. February 18, 2015 – arbitrator communicates to both parties, directing the Police to comply in full with respect to reinstatement and providing the Union with the requested information, setting a 30-day deadline for compliance.

13. March 13, 2015 – Police notifies the Union that it will not comply with the arbitration award, citing jurisdictional grounds.

14. March 23, 2015 – arbitrator notifies the parties of the procedures he will use to determine compensation for the officer.

15. June 17, 2015 – arbitrator issues a final order clarifying and amending the May 13, 2014 award, calculating compensation and ordering the Police to reinstate the officer immediately.

16. July 28, 2015 – Union files its unfair labor practice charge.

The Police argues that the 180-day time period should run starting sometime between December 15, 2014, the first business day after the Board denied the Police's exceptions to the arbitration award, and January 26, 2015, when it allegedly was clear to the Union that the Police would not meet its obligations. The Police contends that the time for filing should begin to run when the Union knew or should have known that the Police would not comply. Here, the Police tries to impose what is known as the discovery rule as the test for when the filing time should be triggered. But the discovery rule has no place when measuring the time for filing an unfair labor practice complaint, having been flatly rejected in *NTEU* in favor of the standard set forth above. 392 F.3d at 501. And even if the discovery rule had any weight in this case, the Police could hardly claim that the Union knew or should have known that the Police would not comply during a time when the Police told the Union it did not know whether its client would comply. The Police's position on the test for measuring time wholly lacks merit.

Under the correct standard, the question is whether more than 180 days passed after the Police gave actual notice that it would not comply, or after the deadline set by the arbitrator for compliance.

The record demonstrates that the deadline for compliance set by the arbitrator on February 18, 2015, was March 20, 2015.[2] And the date on which the Police announced it would not comply was March 13, 2015. The unfair labor practice complaint was filed within 180 days of both March 13 and 20, and therefore was timely filed.

## FAILURE TO PROVIDE INFORMATION AS AN UNFAIR LABOR PRACTICE

The Police argued below that failure to provide the information requested by the Union as necessary for it to participate in implementation of the arbitral award is not an unfair labor practice. Its argument was based on its jurisdictional challenges to arbitration over employee terminations, and on the alleged failure of the arbitrator to comply with CBA provisions covering requests for information. The hearing officer rejected the challenge, stating that the CBA provided sufficient authority for the arbitrator to enforce information requests.

The Board sustained the hearing officer's determination that failure to provide the requested documents constituted an unfair labor practice. In doing so, the Board rejected the primary jurisdictional challenge (as did *Capitol Police I* and as do we), and affirmed the hearing officer's findings that the arbitrator exercised proper authority under the CBA in pressing the Police to comply with the Union's information requests.

---

[2] Although the Board implied that the 30-day deadline concluded on March 17, 2015, we note that 30 days from the date of the arbitrator's decision is March 20, 2015. *See* J.A. 6 ("[T]he Arbitrator ordered the [Police] to comply with his Award within 30 days, i.e., by March 17, 2015."); J.A. 507 (arbitrator's decision dated February 18, 2015, setting 30-day deadline).

The Police repeats here its previous challenge to the Board's decision sustaining the unfair labor practice charge for failure to comply with the Union's information requests. Like the Board, we conclude that the Police's challenge lacks merit.

## CONCLUSION

For the reasons set forth above, we hold that the Police's petition for review lacks merit, and must be denied. As the Police's challenge to the OOC's application seeking enforcement of the Board's decision and order depends on its jurisdictional challenge to the Board's final decision, its opposition to the OOC's application fails. We therefore grant the OOC's application for enforcement of the Board's September 25, 2017 decision and order.

## DENIED AS TO 2018-1201 AND GRANTED AS TO 2018-1395

### COSTS

No costs.